UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WENDY SWOLINZKY, | | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| BEVERLY WRIGHT, SPENCER BOOKER, | * | Civil Action No. 16-cv-10669-ADB |
| and JAMES NEWMAN, as they are the | * | |
| AQUINNAH BOARD OF SELECTMEN, and | * | |
| BEVERLY WRIGHT, individually, AND | * | |
| VERNON WELCH, | * | |
| | * | |
| Defendants. | | |

## MEMORANDUM AND ORDER ON DEFENDANTS AQUINNAH BOARD OF SELECTMEN'S AND BEVERLY WRIGHT'S MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Wendy Swolinzky brought suit against Defendants Beverly Wright, Spencer Booker, and James Newman, as the Aquinnah Board of Selectmen ("Board of Selectmen" or "the Board"), Beverly Wright individually, and Vernon Welch (collectively, "Defendants") seeking recovery for the Board of Selectmen's allegedly impermissible taking of her property. [ECF No. 19 ("Amended Complaint" or "Am. Compl.")]. Currently pending before the Court are the Board of Selectmen's and Beverly Wright's motions for summary judgment, as well as Vernon Welch's response to the motions for summary judgment. [ECF Nos. 60, 62, 74]. For the reasons set forth below, summary judgment is <u>GRANTED</u> on all counts of the Amended Complaint in favor of Defendants Board of Selectmen, Ms. Wright, and Mr. Welch.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the Defendants' Statement of Material Facts, [ECF No. 64 ("SOF")], and are either uncontroverted pursuant to Federal Rule of Civil Procedure 56

and Local Rule 56.1[1] or stated in the light most favorable to Ms. Swolinzky, as the non-moving party.[2]

## A.    Ms. Swolinzky's Business Operations

At all relevant times, Ms. Swolinzky has operated a seasonal boat and kayak rental business, known as Book-A-Boat, off of land leased to her by the Town of Aquinnah in Massachusetts ("Aquinnah" or "the Town").  [SOF ¶ 1].  The land Ms. Swolinzky leases is known as "Lot B," which is a waterfront property on Menemsha Creek.  [SOF ¶ 2].  Ms. Swolinzky's lease for Lot B previously had a term of July 1, 2012 through June 30, 2017, but during the lease period Ms. Swolinzky executed a new lease, which has a current term of July 1, 2015 through June 30, 2020.  [SOF ¶¶ 3–4].

---

[1] Defendants, as the moving parties, filed "a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried . . . ." L.R., D. Mass. 56.1. Ms. Swolinzky provided a paragraph-by-paragraph response to Defendants' SOF as well as her own "Counterstatement of Undisputed Material Facts." [ECF No. 72]. Local Rule 56.1 requires a party opposing a motion for summary judgment to provide "a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried." L.R., D. Mass. 56.1. This may take the form of a paragraph-by-paragraph rebuttal or "a statement of facts [the opposing party] believe are still under dispute." Evergreen Partnering Grp., Inc. v. Pactiv Corp., 832 F.3d 1, 4 n.2 (1st Cir. 2016). Here, Ms. Swolinzky's paragraph-by-paragraph rebuttal comports with Local Rule 56.1, but her "Counterstatement of Undisputed Material Facts" does not. Accordingly, the Court relies on Ms. Swolinzky's paragraph-by-paragraph rebuttal and only considers her "Counterstatement" to the extent it identifies a disputed material fact with the support required by Local Rule 56.1.

[2] The Court notes that while Ms. Swolinzky purports to controvert portions of the SOF, she frequently fails to cite any record evidence in support of her position. Controverted facts must be supported by reference to record evidence. See L.R., D. Mass. 56.1 ("A party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."). The portions of the SOF not specifically controverted with support in the record are deemed admitted. See Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) ("In the event that a party opposing summary judgment fails to act in accordance with the rigors that [a local rule governing summary judgment] imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated.").

Camille Rose held the lease to the adjacent "Lot A" through June 30, 2013.[3] [SOF ¶ 5]. A small fishing shack ("the shack") sits on Lot A. [SOF ¶ 6]. While Ms. Rose was the lessee of Lot A, she and Ms. Swolinzky considered Ms. Rose to be the owner of the shack. [SOF ¶ 19]. From approximately 2006 through 2013, with Ms. Rose's permission, Ms. Swolinzky conducted her business from the shack on Lot A while she was the lessee of Lot B. [SOF ¶ 20]. On April 11, 2013, Ms. Swolinzky purchased the shack from Ms. Rose for $30,000 and received a Bill of Sale from Ms. Rose. [SOF ¶¶ 40, 53].

### B.     The Shack's Disputed Ownership

The shack has stood on what is now referred to as Lot A for over 100 years. [SOF ¶ 6]. Notwithstanding Ms. Swolinzky's purchase of the shack from Ms. Rose, the parties dispute the Town's ownership rights in the shack. [ECF No. 72 at 2–3].

Lot A and the shack are both currently situated in Aquinnah.[4] [SOF ¶ 67]. The earliest documentation provided by the parties, a 1939 Department of Public Works Plan ("1939 Plan"), shows the shack as existing and situated on "Lot 15" on land owned by the Commonwealth. [SOF ¶ 7]. Neither party knows who built the shack prior to 1939. On May 22, 1965, the Massachusetts State Legislature approved "An Act authorizing the Department of Public Works to convey certain land of the Commonwealth to certain towns." [SOF ¶ 8]. Section 1 of that Act conveys to Aquinnah[5] and the Town of Chilmark ("Chilmark"), which shares a boundary with Aquinnah, certain lots "located along the southwesterly side of Menemsha Basin and running

---

[3] Alfred Vanderhoop was the leaseholder prior to Ms. Rose. [SOF ¶ 57].

[4] Prior to 2017, Lot A and the shack were situated in both Aquinnah and the neighboring Town of Chilmark. [SOF ¶ 17]. Although the lot was situated in both towns, Aquinnah had historically managed the issuance of leases on Lot A. [Id.]. In January 2017, special legislation was signed by the Governor approving a new boundary line so that the shack would fall within Aquinnah only. [SOF ¶ 67].

[5] The text of the statute refers to the Town of Gay Head, which is the former name for Aquinnah.

along the northwesterly side of Menemsha Creek" as more fully described in a recorded plan. [SOF ¶ 9]. The Act further describes the lots as "being the land excepted from the original petition under Land Court Case No. 7706 because of its status as land of the commonwealth." [ECF No. 65-8 at 3]. Section 2 of the Act provides: "The aforesaid land at Menemsha authorized to be conveyed to the towns of [Aquinnah] and Chilmark shall be reserved for and made available to commercial fishermen and shall in no event be sold or conveyed." [Id.]. On April 13, 1970, the Commonwealth, through its Department of Public Works, conveyed by deed the land described in the Act, Mass. Acts 1965, ch. 485, to Aquinnah. [SOF ¶ 10]. The deed states that "[t]he above-described land shall be reserved for and made available to commercial fishermen and shall in no event be sold or conveyed, in accordance with the second sentence of Section 2 of said Chapter 485 of the Acts of 1965." [Id.].

On May 14, 1992, Alfred Vanderhoop bequeathed to the Alfred A. Vanderhoop Educational Trust (the "Trust") "my shack located on the creek or southerly side of Menemsha Harbor basin upon the condition that the same be auctioned or sold in a commercially reasonable manner and that the proceeds of the same fund the Educational Trust I have created." [SOF ¶ 58]. The record does not provide details concerning Alfred Vanderhoop's possession of the shack and does not indicate when he first asserted ownership of the shack. David Giles, Berta Welch, and Thelma Weissberg were named trustees of the Trust. [ECF No. 65-26 at 1]. Ms. Rose, who was Alfred Vanderhoop's partner, was named the executrix of his last will and testament. [SOF ¶ 57; ECF No. 65-6 at 15; ECF No. 65-26 at 23].

Ms. Swolinzky contends that she owns the shack because she purchased it from Ms.

Rose, who sold it as executrix of Alfred Vanderhoop's will.[6]   See [SOF ¶¶ 40, 53]; see also [ECF

No. 65-2 at 19].[7]   The Town asserts ownership over the land on which the shack sits by virtue of

the deed from the Commonwealth and argues that the shack is a fixture that it owns, and

presumably has owned since the 1970 transfer, along with the underlying land.[8]   See [SOF ¶¶ 6–

10; ECF No. 63 at 11–13].

---

[6] Ms. Rose, individually and as executrix of Alfred Vanderhoop's will, and Ms. Welch and Mr. Giles, as Trustees, litigated a dispute concerning the shack and other property in Probate and Family Court, which was settled in January 2014 for $150,000.  See [ECF No. 73-8].  In regards to the shack, the parties agreed that "[f]or purposes of the Probate of the Estate of Alfred A. Vanderhoop, the Trust acknowledges the authority of Rose, as Personal Representative of the Estate, to sell the Shack and waives any claim to the sale proceeds or challenge to the Bill of Sale."  [Id. at 3].  The Trust's acknowledgment of Ms. Rose's authority to sell the shack is not binding here.

[7] At the deposition of Ms. Swolinzky, the following questions were asked and answered:

> A: . . . I wanted to know did Camille really have the right to sell me this shack or was this perhaps something she could be making up?  I don't know her that well. I know who she is.  I don't hang out with her.  There's nothing like that.
> Q: So after looking at these documents, what opinion did you form in your mind?
> A: I formed in my mind that she -- that the shack was listed as personal property in the will, and that she was the executrix of the will and that she had the right to sell it to me.
> Q: Did you consult an attorney before you formed that conclusion or did you just form that conclusion on your own?
> A: I formed that conclusion on my own, and then I did hire [an attorney] before I bought the shack just to make sure because $30,000 was -- is a huge amount of money for me . . . . And I just didn't want to be thrown out the window haphazardly, and she really didn't have a right, and it really belonged to the Alfred Vanderhoop Trust or to Alfred's will.  I didn't know.  I thought that my reading of it was that I was good to go . . .

[ECF No. 65-2 at 19–20].

[8] The record does not contain sufficient facts to determine whether the shack is a fixture. Ownership of a fixture is a question of fact "that turns on whether the items attached to the realty can be removed without material injury to the premises, and whether if removed, the items would lose their essential character or value.  Another important consideration is the intent of the owner of the items upon installation."  Commonwealth v. Bundza, 763 N.E.2d 545, 547 (Mass.

### C.      Menemsha Creek Agreement

In November 1995, Aquinnah and Chilmark entered into the "Menemsha Creek Agreement" ("the Agreement"), which sets forth their joint administration of the waterfront lots. [SOF ¶ 11]. In the Agreement, the two towns define a "commercial fisherman" as "any person who for profit, cultivates, harvests, catches or takes or attempts to cultivate, harvest, catch or take any fish or shellfish for purpose of sale, barter or exchange." [Id.]. The Agreement contains the following provisions: (i) "[n]o subletting or shared usage of lots is permitted;" (ii) "[n]o more than one lot shall be leased to an individual;" and, (iii) "[u]pon cessation of fishing activity, as outlined above, the lot shall be returned to the town for lease to another qualified commercial fisherman."[9]   [SOF ¶¶ 12–14].

The Agreement also states that "[t]he Board of Selectmen of each town shall have the authority to veto the issuance of a new lease by the Board of Selectmen in the other town . . . ." [SOF ¶ 15]. Pursuant to this Agreement, on February 4, 1997, Chilmark voted to veto Ms. Swolinzky's lease of Lot B. [SOF ¶ 18]. Two years later, on July 16, 1999, Chilmark wrote to the Aquinnah Board of Selectmen to express concerns about Ms. Swolinzky's usage of Lot B. [Id.]. Specifically, Chilmark was concerned with Ms. Swolinzky's use of proposed docks on Lot B, which "sounded more like a marina-type use" rather than "commercial fishing." [ECF No. 65-12 at 3].

---

App. Ct. 2002) (internal citations omitted). Here, it appears that the shack can be removed from the land, but it is not clear if such removal would materially injure the premises. See [ECF No. 65-2 at 8 ("Q: Based upon the review by engineers, is the move of the shack actually feasible? A: Oh, yeah, easy."); ECF No. 65-33]. It is likely that moving the shack would not cause it to lose its essential character or value, particularly if it were moved to Lot B, which is only several feet away from its original location. Finally, there is no information in the record concerning the builder of the shack and his or her intent upon installing it on the land.

[9] Ms. Swolinzky contends that only the one-lot restriction was ever enforced. See [ECF No. 72 at 3–6].

### D.       Termination of Ms. Rose's Lease

On or about December 5, 2012, Aquinnah wrote to Ms. Rose to inform her that Aquinnah would not renew her lease for Lot A when it expired on June 30, 2013 because she had violated the sections of the lease that required operation of a business and prohibited shared usage of lots. [SOF ¶ 21]. Aquinnah also requested that Ms. Rose inform the Town of her "plans to move the [shack] off the lot," and stated that if the shack was "not removed by July 1, 2013, [Aquinnah] will be forced to have it removed."  [SOF ¶ 22].

### E.       Board of Selectmen Meetings

At the relevant times in 2013, the Aquinnah Board of Selectmen was a three-member Board compromised of James Newman, Spencer Booker and Ms. Wright.  [SOF ¶ 26].

### 1.       January 8, 2013 Board of Selectmen Meeting

On January 8, 2013, Ms. Swolinzky appeared before the Board of Selectmen to discuss Lots A and B and her use of the shack. [SOF ¶ 27]. At the meeting, the Board was also informed by letter that Ms. Rose sought to sell the shack on Lot A to Ms. Swolinzky.  [SOF ¶ 28]. Mr. Newman proposed that Ms. Swolinzky swap lots (from Lot B to Lot A) when Ms. Rose's lease expired in order for Ms. Swolinzky to continue to use the shack on Lot A as she sought.  [SOF ¶ 29]. Ms. Swolinzky proposed an alternative approach of reconfiguring the lot lines between Lots A and B because Lot A did not have enough frontage for her to operate her boat rental business.  [SOF ¶ 30]. At the time, Lot A had approximately 35 feet of waterfront frontage and Lot B had approximately 69.9 feet of waterfront frontage. [Id.]. Ms. Wright did not know whether the Board of Selectmen had the ability to change lot lines for Town property. [SOF ¶ 32]. The Board took Ms. Swolinzky's proposal under advisement until the next Board meeting on January 22, 2013. [SOF ¶ 31].

2.     January 22, 2013 Board of Selectmen Meeting

At the January 22, 2013 Board meeting, Ms. Wright was concerned with whether the Board of Selectmen could redraw lot lines and she expressed concern about the possibility of a state agency later telling the Town that they could not make such changes. [SOF ¶ 33]. Nonetheless, Ms. Wright and the two other members of the Board of Selectmen voted unanimously on January 22, 2013 to move the lot line so that the waterfront frontage was reduced to 35 feet on Lot B and increased to 69.9 feet on Lot A. [SOF ¶ 34]. The Board of Selectmen also voted unanimously at the January 22, 2013 Board meeting in favor of a motion "that as of July 1st, 2013, the town will enter into a new lease agreement for [Ms. Swolinzky] to have Lot A." [ECF No. 65-16]; see also [SOF ¶ 35; ECF No. 73-5]. Ms. Swolinzky understood that Ms. Rose's lease of Lot A ran through June 30, 2013 and that her own lease of Lot B would continue until she executed a new lease for Lot A. [SOF ¶ 36]. The Town never provided, and Ms. Swolinzky never signed, any lease documents for Lot A, and Chilmark never approved any lease for Ms. Swolinzky for Lot A. [SOF ¶¶ 47–48]; see [ECF No. 65-2 at 15].

3.     February 5, 2013 Board of Selectmen Meeting

Per Aquinnah's custom, a waitlist existed for parties interested in the waterfront lots in Menemsha Creek. [SOF ¶ 25]. Brian Vanderhoop ("Mr. Vanderhoop") was first on the waitlist as of February 5, 2013. [SOF ¶ 37]. On February 5, 2013, Mr. Vanderhoop appeared at the Board of Selectmen meeting and questioned why the available lot for the next person on the waitlist was Lot B, rather than Lot A, which was the lot that Ms. Rose was vacating. See [id.]. He also queried whether the Board of Selectmen had the authority to move the lot lines because part of Lot A was located within Chilmark. [Id.]. Mr. Vanderhoop requested that the Town divide the waterfront frontage between Lots A and B equally if the Town determined that it was

necessary to redraw the lot lines.  [Id.].  The minutes from the meeting also reflect that "[i]t was

explained that [Ms. Swolinzky] was acquiring the shed that was part of Lot A and that it made

sense for her to slide her operation over and have Lot B become the available lot."  [ECF No. 65-

17].

On February 27, 2013, Mr. Vanderhoop wrote to the Board of Selectmen requesting that

it reverse its January 22, 2013 decision and divide the frontage of Lots A and B equally.  [SOF

¶ 38].

4.     April 2, 2013 Board of Selectmen Meeting

The minutes from the April 2, 2013 Board of Selectmen meeting reflect the following:

> The Selectmen took up next under New Business a letter sent to them by Brian
> Vanderhoop asking that there be consideration made to reconfigure the
> Menemsha lease lot he had recently been awarded.  The lot, Lot "B," had been
> reduced in size to accommodate the 60' of floating dock [Ms. Swolinzky] was
> moving to Lot "A".  He asked that the two lots combined had 96' of water
> frontage.  He needed more than 35' and asked that it be split down the middle –
> 48' for each lot.  [Ms. Swolinzky] spoke of her business needing the space to
> accommodate all the boats she rents.  Not only did she need the 35' space in
> front of the [shack] on Lot "A" she had been using the last seven years but an
> extension to 60' to have enough room for the two floating docks she uses for her
> 'Book-a-Boat' business.  [Ms. Swolinzky] handed out a color version of the site
> plan drawn up back in '92.  There was discussion about legal ownership of the
> [shack] and [Ms. Swolinzky's] purchasing of it. . . . [Mr. Vanderhoop] said he
> thought it was decided that the town would take ownership of the [shack] and
> make it the Harbormaster's office.  [Mr. Booker] said it was a great idea but
> with the owner not wanting to sell or donate the [shack] to the town, it wasn't
> going to work.  [Mr. Booker] said all the lease lot's frontage on the Menemsha
> Creek needs to be looked at.  There was discussion about the lot lines needing to
> be resurveyed and to have an official certified site plan that would then be deed
> registered.  The Board, by consensus, took [Mr. Vanderhoop's] request under
> advisement until April 16th.  [The Town Administrator] was instructed to
> contact all the lease lot holders and have them attend the meeting.

[ECF No. 65-19].

While the discussions for Lot A were ongoing, Aquinnah was informed on or about April 15, 2013, that the lease for Lot F, which had been held by Lynn and Susan Murphy, would not be renewed. [SOF ¶ 41].

5.    April 23, 2013 Board of Selectmen Meeting

On April 23, 2013, the Board met to consider Mr. Vanderhoop's request "to reconsider the action taken by the Board on January 22nd to reduce the water frontage for Lot B to 35 feet and increase the frontage for Lot A to 70 feet." [ECF No. 65-22 at 2]; see [SOF ¶ 42]. The minutes from the meeting reflect that Mr. Newman raised the issue of "what will happen to [Ms. Swolinzky's] ownership of the [shack]," and Ms. Swolinzky indicated that she had already purchased the shack from Ms. Rose on April 11, 2013. [ECF No. 65-22 at 2].

Ms. Wright made a motion to rescind the prior grant of Lot A to Ms. Swolinzky. [SOF ¶ 43]. Mr. Newman seconded the motion. [Id.]. Thereafter, Ms. Wright and Mr. Booker voted in favor of Ms. Wright's motion to rescind, and Mr. Newman abstained. [Id.].

The effect of the vote was to revert to the status quo whereby Lot B would remain leased to Ms. Swolinzky and Lot A would be opened up to the existing waitlist along with Lot F, which was being vacated by the Murphy's. Following the vote, Mr. Vanderhoop, who was first on the waitlist, indicated to the Board of Selectmen that his preference was to lease Lot F, rather than Lot A.[10] [SOF ¶¶ 42, 44; ECF No. 65-22 at 3]. Vernon Welch was next on the waitlist after Mr. Vanderhoop. [SOF ¶ 45].

Ms. Swolinzky contends that Ms. Wright rescinded her vote in an effort to award use of the shack on Lot A to Mr. Welch because of personal ties Ms. Wright has with the Welch family,

---

[10] On June 13, 2013, Aquinnah received correspondence from Chilmark approving Mr. Vanderhoop's lease of Lot F. [SOF ¶ 49]. In this letter, Chilmark also sought to discuss the 48-year practice of allowing Aquinnah to manage Lots A and F. [Id.].

including that her husband is a first cousin of Berta Welch; that her husband and Ms. Welch are both members of the Wampanoag tribe; that Ms. Wright has worked for Ms. Welch; and that Ms. Wright regularly socializes with the Welch family.   [SOF ¶¶ 51–52; Am. Compl. ¶ 21].

F.      **Lease of Lot A to Mr. Welch**

On May 1, 2013, the Board of Selectmen, through the Town Administrator, wrote to Mr. Welch informing him that Lot A was available for lease.   [SOF ¶ 46]. In its letter, the Town stated that "there is an agreement in place between Aquinnah and Chilmark that allows the vetoing of a new lease by the [Board of Selectmen] in the other town if the Lessee does not satisfy various conditions as set forth in the agreement . . . ." [Id.].   On June 20, 2013, the Town informed Mr. Welch that the Chilmark Board of Selectmen had approved Aquinnah's four-year lease of Lot A to him.   [SOF ¶ 50].

Prior to executing a lease with Mr. Welch, the Board of Selectmen solicited the opinion of their counsel about how to best address the proposed lease of Lot A to Mr. Welch given Ms. Swolinzky's contention that she had purchased the shack on Lot A from Ms. Rose.  [SOF ¶ 59]. The Selectmen shared this opinion with Mr. Welch and Ms. Swolinzky at the time.   [Id.].   On July 17, 2013, the Town, through its counsel, wrote to Ms. Swolinzky in an effort to assist the parties in resolving the dispute concerning the status of the shack.   [SOF ¶ 60].

G.      **Ms. Swolinzky's Application to the Planning Board**

On July 29, 2013, after Mr. Welch's lease of Lot A had begun, Ms. Wright also wrote a letter, in her capacity as Chairwoman of the Board of Selectmen, to give Ms. Swolinzky permission to file and apply for permits and licenses for the removal of the shack on Lot A and placement of it on Lot B.  [SOF ¶ 61]. On June 6, 2013, Ms. Swolinzky filed her original application to the Planning Board for a special permit to move the shack from Lot A to Lot B.

[ECF No. 73-9].  Ms. Swolinzky rescinded her application to the Planning Board before she initiated this action in December 2013.  [SOF ¶ 62].

  **H.**  **Procedural History and Events Following the Initiation of this Action**

  On December 4, 2013, Ms. Swolinzky filed a complaint in the Superior Court for Dukes County ("Superior Court") alleging breach of contract, promissory estoppel, and interference with contractual and advantageous business relations against the Board of Selectmen and Ms. Wright individually.  [ECF No. 7 at 6, 13–15].  The Board of Selectmen and Ms. Wright moved to dismiss the claims against them on December 9, 2013.  [Id. at 33].

  While awaiting the Superior Court's decision on the motion to dismiss, on February 5, 2014 Aquinnah sent a written notice to Ms. Rose and Ms. Swolinzky that the Town was exercising its express right, under Section 17 of its lease[11] with Ms. Rose, to assume control over whatever property interest she had in the shack on Lot A because of Ms. Rose's failure to remove the shack after termination of its lease and because the stated plan for moving the shack was impractical and the continued delay was prejudicing the existing tenant's rights to use of Lot A.  [SOF ¶ 63].

  On April 15, 2014, the Superior Court denied the motion to dismiss and concluded that the arguments were best raised on a motion for summary judgment.  [ECF No. 7 at 34].  On April 22, 2014, Ms. Swolinzky amended her complaint to add a claim for unconstitutional taking and to add Mr. Welch as a defendant.  [Id. at 101–09].  Ms. Swolinzky amended her complaint once again on March 9, 2016 to add claims under the Massachusetts Declaration of Rights and 42 U.S.C. §§ 1983 and 1985 as well as a claim for civil conspiracy.  [Id. at 250–59].  On April 7,

---

[11] Section 17 of the lease required the lessee to "remove all Lessee's structures, improvements, personal property, goods and effects from the [Lot]" at the expiration or other termination of the lease and to "deliver the [Lot] to the [Town] in the same condition" at it was at the commencement of the lease.  [SOF ¶ 24; ECF No. 65-4].

2016, the case was removed to this Court, [ECF No. 1], and on October 24, 2016, Ms. Swolinzky amended her complaint again, [ECF No. 19].

The parties attempted to mediate the dispute during the course of the litigation. On June 13, 2017, allegedly at the suggestion of a Court mediator, the Town sought a special permit from the Town's Planning Board to relocate the shack from Lot A to Lot B. [SOF ¶ 64; see [ECF No. 72 at 17–18]. The Aquinnah Planning Board Plan Review Committee ("Planning Board") held a public hearing on the request for a special permit to relocate the shack on November 8, 2017. [SOF ¶ 65]. On or about November 21, 2017, the Planning Board issued a decision on the special permit application in which it denied the relocation of the shack from Lot A to Lot B, but allowed for the construction of a new, identical shack on Lot B. [SOF ¶ 66; ECF No. 65-33 at 3–4]. The Planning Board's decision explained that it "could not reach agreement on the risks and wisdom of relocating and significantly modifying the existing shack given its historic significance . . . ." [ECF No. 65-33 at 3].

The parties terminated efforts to mediate in January 2018 after the Planning Board declined to allow Ms. Swolinzky to relocate the shack from Lot A to Lot B. See [ECF Nos. 40, 53]. On June 11, 2018, the Board of Selectmen and Ms. Wright moved for summary judgment on all counts against them. See [ECF Nos. 60, 62].[12]

---

[12] On July 27, 2018, Mr. Welch filed a document styled as a "Response of Vernon Welch to the Defendants', Aquinnah Board of Selectmen's, Motion for Summary Judgment." [ECF No. 74]. In this "response," Mr. Welch "supplements" the Board of Selectmen's motion for summary judgment and requests that summary judgment be granted on all counts as to him. [Id. at 4]. Pursuant to a Court order, the deadline for filing summary judgment motions was extended to June 11, 2018. [ECF No. 59]. Opposition motions were due on July 2, 2018 pursuant to Local Rule 7.1. Upon request, the Court extended Ms. Swolinzky's response deadline to July 27, 2018. [ECF No. 69]. Leave of the Court is required to submit reply briefing. The papers submitted by Mr. Welch, therefore, did not meet the deadline for summary judgment motions or opposition briefs and were not submitted with leave of the Court as a reply brief. Without a motion under

## II.    LEGAL STANDARD

Summary judgment is appropriate where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted).

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the movant takes the position that the record fails to make out any trialworthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. N. Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

---

Rule 6(b), the Court is bound by the Federal Rules of Civil Procedure and unable to extend the deadline for summary judgment briefing.

Nevertheless, the Court may *sua sponte* enter summary judgment where two conditions are met: "(1) the case must be sufficiently advanced in terms of pretrial discovery for the summary judgment target to know what evidence likely can be mustered, and (2) the target must have received appropriate notice." Rogan v. Menino, 175 F.3d 75, 79 (1st Cir. 1999). Both conditions are met here. First, discovery in this matter has closed. Second, Ms. Swolinzky has received actual notice of the grounds for summary judgment from Mr. Welch's filing, which essentially adopts the Town's summary judgment brief, and she could have sought leave from the Court to reply to his motion at any time over the past seven months. Accordingly, the Court will address herein whether summary judgment in favor of Mr. Welch is proper.

In reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation," Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  Further, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## III.   CONTRACT CLAIMS

### A.   Breach of Contract[13]

The parties disagree as to whether the Board of Selectmen's vote on January 22, 2013 created an enforceable agreement between Ms. Swolinzky and Aquinnah.  Compare [ECF No. 63 at 8], with [ECF No. 71 at 5].  In Massachusetts, "[a]n enforceable agreement requires (1) terms sufficiently complete and definite, and (2) a present intent of the parties at the time of formation

---

[13] Aquinnah argues that Ms. Swolinzky's claim against the Board of Selectmen for breach of contract is mooted by her execution of a new lease for Lot B that runs through June 30, 2020. [ECF No. 63 at 6–7].  While "[i]t is ordinarily true that a challenge to a contract becomes moot upon that contract's expiration," where more than nominal damages are sought, the parties can retain a legally cognizable interest in the case's outcome such that the claim is not moot.  See ACLU of Mass. v. U.S. Conf. of Catholic Bishops, 705 F.3d 44, 53 (1st Cir. 2013).  Here, although Ms. Swolinzky seeks to enforce a contract that she claims would have run from July 1, 2013 to June 30, 2018, and has therefore now expired, she also seeks more than nominal damages and claims $30,000 in reliance damages. [Am. Compl. ¶¶ 27, 29].  Therefore, Ms. Swolinzky's breach of contract claim is not mooted by the expiration of the contract at issue.

to be bound by those terms." Targus Grp. Int'l, Inc. v. Sherman, 922 N.E.2d 841, 848 (Mass.

App. Ct. 2010). "Whether contract terms are complete and definite is a question of law."

Rodriguez v. MBTA, 80 N.E.3d 365, 368 (Mass. App. Ct. 2017).

"Massachusetts courts have found preliminary writings to be incomplete and nonbinding

in circumstances in which essential terms remained unresolved or in which the participants

visibly reserved their commitment for the later documents." Targus, 922 N.E.2d at 848. In the

case of leases, the fact that a formal lease would need to be drawn up later, however, does not by

itself defeat a claim that a preliminary writing is an enforceable agreement, see Sands v. Arruda,

270 N.E.2d 826, 829 (Mass. 1971) ("No contract otherwise binding is to be treated as a nullity

solely because it is a contract to execute still another document or instrument in the future."), so

long as the essential terms of the lease agreement are set forth in the preliminary writing.

Specifically, "[i]t is an essential element in a lease for a term that there be a demise for a period

definitely fixed or at least capable of definite ascertainment." Simon v. Simon, 625 N.E.2d 564,

567 (Mass. App. Ct. 1994) (quoting Farris v. Hershfield, 89 N.E.2d 636, 637 (Mass. 1950)).

"The writing offered . . . must set forth that essential element with reasonably certainty." Id.

(citing Restatement (Second) of Contracts § 131(c) (Am. Law. Inst. 1979)). "Moreover, this

essential term cannot be provided by implication." Id. (citing 4 Williston on Contracts § 575 at

80 n.11 (3d ed. 1961)).

Ms. Swolinzky contends that the terms agreed upon were complete and definite and that

"[o]n January 22, 2013, the Board of Selectmen of Aquinnah entered into an agreement with

[her], whereby the [] Board agreed to lease to [Ms. Swolinzky] and [Ms. Swolinzky] agreed to

rent the premises described as follows: Lot A with frontage increased to 69.9 feet, lease to

commence July 1, 2013 at the annual rent of $450.00 for a term of five years." [ECF No. 71 at

5]. She further argues that the terms of the agreement were memorialized in the audio-tape, transcript, and minutes of the January 22, 2013 meeting, and confirmed by the February 5, 2015 minutes. [Id. at 6–7]. Aquinnah opposes Ms. Swolinzky's characterization claiming that the "records" of the January 22, 2013 meeting fail to establish that complete and definite terms were agreed upon by the parties.[14]   See [ECF No. 63 at 9]. Aquinnah also avers that the January 22, 2013 Board of Selectmen vote was merely the first of several steps in the process of executing a contract. [Id. at 8].

Before analyzing whether the records of the January 22, 2013 meeting constituted a complete agreement between the parties, the Court must first determine which records are appropriate to consider. Under the Massachusetts Statute of Frauds, a plaintiff may only bring an action on a contract for the sale of land or any interest concerning land if the "promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith . . . ." Mass. Gen. Laws ch. 259, § 1. Ms. Swolinzky presents an audio-tape, transcript, and minutes, as well as additional minutes allegedly approving the original minutes, as writings that memorialize the agreement and satisfy the Statute of Frauds. [ECF No. 71 at 6–7]. The audio-tape clearly is not a "writing" or "memorandum" and will not be considered. The transcript of the meeting was created after this law suit was initiated. [ECF No. 73-5 at 17]. The meeting itself occurred almost a year before the transcript was created, and the transcript was created from a recording that could not itself be used to establish the existence of a contract. Under these circumstances, Ms. Swolinzky may not rely on the transcript to establish the existence of a contract, particularly when there are minutes of the same meeting that constitute the official record of the meeting. See 10 Richard A. Lord,

---

[14] Aquinnah has not pled the Statute of Frauds as an affirmative defense. See [ECF No. 24 at 7–9].

Williston on Contracts § 29:5 (4th ed.) (noting general rule that "the required memorandum may be made at any time subsequent to the making of the contract and prior to the bringing of an action," and the exception, not present here, that "a pleading or affidavit, or a similar sworn judicial document or statement, made by the defendant" may be considered even though not made until after the action is commenced).   Therefore, the Court considers only whether the minutes from the January 22, 2013 meeting created an enforceable lease agreement between the parties.[15]

The minutes from the January 22, 2013 meeting reflect the following:

Jim made a motion to move the lot line so that Lot B is reduced to 35 feet and increase Lot A to be 69.9 feet. . . . The Board voted 3 - 0 in favor. The motion passed. . . . Beverly made a motion that as of July 1st, 2013, the town will enter into a new lease agreement for Wendy to have Lot A.  Jim seconded. The Board voted 3 - 0 in favor.  The motion passed.

[ECF No. 65-16 at 2].

The minutes of the January 22, 2013 meeting do not contain reference to the term period of the lease, which was an essential term of the lease agreement.   See [ECF No. 65-16 at 2]; Simon, 625 N.E.2d at 567.  Ms. Swolinzky claims that the vote on January 22, 2013 awarded her a five-year lease, but that term was never reduced to writing.   Even if the audio-tape transcript, which does include a reference to a term of five years, could be considered a "writing," the fact that Mr. Vanderhoop entered into a four-year lease for Lot A calls into question whether the Town intended as of January 22, 2013 to enter into a four- or five-year lease for the lot.   See

---

[15] Ms. Swolinzky also points to February 5, 2015 meeting minutes and states that they contain the approval of the January 22, 2013 meeting minutes, but no meeting minutes from February 5, 2015 have been submitted as part of the summary judgment record.  See [ECF No. 71 at 7].  To the extent Ms. Swolinzky means to refer to the February 5, 2013 meeting minutes, they also do not contain any approval of the January 22, 2013 meeting minutes.  See [ECF No. 65-17 at 2 ("Jim made a motion to accept the minutes from January 8th.  Beverly seconded.")].

[SOF ¶ 50]; see also [ECF No. 73-12 at 6].[16] Because the January 22, 2013 meeting minutes omit an essential term of the lease agreement, the writing is not an enforceable agreement between Ms. Swolinzky and the Town.[17]

Accordingly, because the terms agreed to by the parties were not "sufficiently complete and definite," there was no enforceable agreement, and summary judgment must be granted for Aquinnah on the breach of contract claim.

### B.    Promissory Estoppel

Ms. Swolinzky seeks to use the doctrine of promissory estoppel as an alternative basis for enforcing the Board of Selectmen's votes on January 8 and January 22, 2013. [Am. Compl. ¶¶ 30–32].[18] "In the absence of a contract in fact, promissory estoppel implies a contract in law

---

[16] At the deposition of Mr. Newman, the following questions were asked and answered:

> Q: Okay, well, you knew the existing lease [for Lot A] didn't expire until June 30th of 2013, right?
> A: Correct.
> Q: All right, was there anything different about the July 1st lease [for Lot A], other than the dimensions and the lot change was going to be added to it?
>      MR. BARNETT: Objection. There was no July 1st lease. You're asking him to speculate on a document that doesn't exist.
> Q: Was there anything else that was going to be altered that you were aware of --
> A: I was not aware of what else was going to be altered or if this was going to be altered, for that matter, until it was is writing.

[ECF No. 73-12 at 6].

[17] In addition, despite arguing that the January 22, 2013 meeting minutes contained complete and definite contract terms, Ms. Swolinzky herself seems uncertain about what specifically was agreed to, including whether her lease for Lot B would be renewed or if she would enter into a new lease for Lot A and which lot would be extended. See [ECF No. 71 at 5–6]. For example, her brief states that "[t]he [Board of Selectmen] minutes . . . reflect the Board's unanimous decision to approve the extension of [Ms. Swolinzky]'s lot to 69,9 feet, [and] renew her lease on July 1, 2013 . . . ." [Id. at 6]; see also [id. at 7 (stating that "the Board was going to approve Ms. Swolinzky's lot being increased and enter into a new lease").

[18] Ms. Swolinzky's brief focuses on the doctrine of equitable estoppel, which is not applicable here and not pled in the Amended Complaint. See [ECF No. 71 at 11–12]. "[E]quitable estoppel

where there is proof of an unambiguous promise coupled with detrimental reliance by the promisee." <u>Malden Police Patrolman's Ass'n v. Malden</u>, 82 N.E.3d 1055, 1064 (Mass. App. Ct. 2017). To succeed on a claim of promissory estoppel under Massachusetts law, a plaintiff must demonstrate that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.'" <u>Rogatkin ex rel. Rogatkin v. Raleigh Am., Inc.</u>, 69 F. Supp. 3d 294, 301 (D. Mass. 2014) (quoting <u>Neuhoff v. Marvin Lumber & Cedar Co.</u>, 370 F.3d 197, 203 (1st Cir. 2004)). "Whether reliance is reasonable is ordinarily a question of fact for a jury. However, if, on the facts alleged . . . no reasonable jury could find that the plaintiff's reliance was reasonable, the defendants are entitled to judgment as a matter of law." <u>Grant v. John Hancock Mut. Life Ins. Co.</u>, 183 F. Supp. 2d 344, 370 (D. Mass. 2002) (quoting <u>Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.</u>, 62 F. Supp. 2d 236, 242 (D. Mass. 1999)).

The Town argues that Ms. Swolinzky's promissory estoppel claim must fail as a matter of law because "[i]t is well-settled law in Massachusetts that the doctrine of promissory estoppel may not be invoked against the government." [ECF No. 63 at 10 (quoting <u>Pavone v. City of Worcester</u>, No. 011607A, 2006 WL 2424706, at *3 (Mass. Super. Ct. July 3, 2006), <u>aff'd</u>, 939 N.E.2d 135 (Mass. App. Ct. 2010))]. Courts have adopted this rule because "[w]here a government official or agency makes promises that are 'contrary to a statute or regulation

_____

permits recovery only where there has been reliance upon the misrepresentation of past or present facts whereas recovery may be had under the theory of promissory estoppel where reliance has been placed upon statements of future intent." <u>Loranger Const. Corp. v. E. F. Hauserman Co.</u>, 374 N.E.2d 306, 308–09 (Mass. App. Ct. 1978). Here, Ms. Swolinzky does not allege that there were any false statements of past fact; rather, her claim rests on an alleged promise of future fact, namely that the Board of Selectmen would change the lot lines between Lots A and B and execute a lease with her for Lot A.

designed to . . . ensure some . . . legislative purpose,' the public interest in strict enforcement of the laws 'overrides any equitable considerations' in enforcing such private promises." Pavone v. City of Worcester, 939 N.E.2d 135, 135 (Table) (Mass. App. Ct. 2010) (quoting Sullivan v. Chief Justice for Admin. and Mgmt. of Trial Court, 858 N.E.2d 699, 712–13 (Mass. 2006)).

It is unnecessary to determine whether the Board of Selectmen's actions in this case were "contrary to a statute or regulation," because Ms. Swolinzky's claim of promissory estoppel fails on the merits. The summary judgment record does not support the conclusion that Ms. Swolinzky's reliance on the Board of Selectmen's alleged promises was reasonable, and, therefore, application of promissory estoppel is not appropriate. See, e.g., Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33–34 (1st Cir. 1988) ("When a person acts in a way contrary to his own acknowledged understanding of the facts, his acts must be deemed unreasonable as a matter of law."); Anzalone v. Admin. Office of Trial Court, 932 N.E.2d 774, 786 (Mass. 2010) (holding that plaintiff's reliance on alleged appointment to job position was unreasonable where he was told that appointment was contingent on additional necessary approvals).

Ms. Swolinzky contends that the Board of Selectmen's promises reasonably induced her to enter into "binding contracts," presumably referring to the purchase of the shack from Ms. Rose on April 11, 2013, and induced her forbearance from seeking alternative business sites or moving the shack. [ECF No. 71 at 8]. She had not, however, received a post-dated lease from the Town before purchasing the shack on April 11, 2013. [SOF ¶ 47]. She also knew that any lease had to be approved Chilmark, but had not received an approval for any lease to Lot A or even a notification that the Chilmark Board of Selectmen would be voting on a lease before she went through with the purchase. See [SOF ¶ 48; ECF No. 65-2 at 17]. Moreover, Ms. Swolinzky was aware as early as January 8, 2013 that there were doubts about whether the

survey for the waterfront lots could be changed.  See [ECF No. 65-14 at 2].  She also was present at the February 5 and April 2 Board of Selectmen meetings where concerns continued to be voiced by Town citizens.  See [ECF No. 65-17 at 4–5; ECF No. 65-19 at 2].[19]

Taking into consideration the foregoing facts, which were known to Ms. Swolinzky, no reasonable jury could find that it was reasonable for her to purchase the shack from Ms. Rose on April 11 in reliance on the January 8 or 22 Board of Selectmen votes.  See Grant, 183 F. Supp. 2d at 370.  For the same reason, any forbearance from seeking alternative business sites prior to making the purchase on April 11 or from moving the shack after the purchase do not constitute reasonable reliance.  Accordingly, summary judgment must be granted for Aquinnah on the promissory estoppel claim.

### C.    Interference with Contractual and Advantageous Business Relationships

Ms. Swolinzky alleges that Ms. Wright's coordination of a rescission of the Board of Selectmen's vote on January 22, 2013 amounted to intentional interference with Ms. Swolinzky's contractual and advantageous business relationships with the Town. [Am. Compl. ¶¶ 33–36]. Ms. Wright moved for summary judgment on this claim on the ground that the undisputed material facts do not demonstrate any improper motive or means by Ms. Wright. [ECF No. 61 at 8–10]. Ms. Swolinzky has failed to oppose Ms. Wright's motion for summary judgment on this claim and, therefore, has waived any argument that Ms. Wright acted with an

---

[19] For example, at the February 5, 2013 meeting, Mr. Vanderhoop questioned why lot lines were being changed and "asked if the Selectmen are allowed to move the lot lines."  [ECF No. 65-17 at 5]. Mr. Vanderhoop also asked the Board of Selectmen to consider splitting Lots A and B down the middle, and the Board of Selectmen took the request under advisement.  [Id.]. At the April 2, 2013 meeting, Mr. Vanderhoop renewed his request to change the frontage on Lots A and B.  [ECF No. 65-19 at 2]. Mr. Booker stated that "all the lease lot's frontage on the Menemsha Creek needs to be looked at."  [Id.]. The Board of Selectmen again took Mr. Vanderhoop's request under advisement until April 16, 2013 and asked the Town Administrator to ask all the lease lot holders to attend the next meeting.  [Id.].

improper motive or means.[20]   See, e.g., Kuznarowis v. Tobey Hosp., 320 F. Supp. 3d 307, 314 (D. Mass. 2018) (deeming claim waived on summary judgment when not opposed); Colucci, Colucci, Marcus & Flavin, P.C. v. Citizens Bank of Mass., No. 15-cv-13536, 2018 WL 1567605, at *3 (D. Mass. Mar. 30, 2018) (same); Consolo v. Bank of Am., No. 15-cv-11840, 2017 WL 1739171, at *5 (D. Mass. May 2, 2017) (same).

        This claim would have been decided in Ms. Wright's favor regardless of the waiver because the record does not support a finding that Ms. Wright acted with improper purpose or means.  To prevail on a claim of interference with contractual and advantageous business relationships, Ms. Swolinzky must show that Ms. Wright "knowingly and for an improper purpose or by improper means induced a party to breach a contract or not to enter into or continue a business relationship, resulting in damage." Buster v. George W. Moore, Inc., 783 N.E.2d 399, 414 (Mass. 2003) (citations omitted).   "[T]he improper motive or malevolence required is actual malice, a spiteful, malignant purpose, unrelated to the legitimate corporate interest." King v. Driscoll, 638 N.E.2d 488, 494–95 (Mass. 1994) (internal quotations and citations omitted).   Neither "[t]he motivation of personal gain" nor "personal dislike" is sufficient.   Id.; see also United Truck Leasing Corp. v. Geltman, 551 N.E.2d 20, 24 (Mass. 1990) (affirming grant of motion for directed verdict on intentional interference where there was "not enough evidence to warrant a finding that his real motive . . . was to hurt [the defendant]").   At most, the undisputed facts show that Ms. Wright had a close friendship with the Welch family and worked part-time for Berta Welch, [SOF ¶¶ 51, 52; ECF No. 73-4 at 7], which is not sufficient to establish a claim of intentional interference, see King, 638 N.E.2d at 495.

---

[20] Ms. Swolinzky's brief contains only scattered references to Ms. Wright, including that the Board of Selectmen's vote on December 3, 2013 "is further evidence of improper motive" by Ms. Wright and that Ms. Wright rescinded her vote on April 23, 2013 "only upon learning that her friend and relative stood to benefit from [her] doing so." [ECF No. 71 at 15, 17].

Accordingly, Ms. Wright's motion for summary judgment on the claim of intentional interference is allowed.[21]

## IV.    CONSTITUTIONAL CLAIMS

Ms. Swolinzky asserts various state and federal constitutional claims premised on her ownership of the shack. See [Am. Compl. ¶¶ 37–56]. As discussed in Section V.A., infra, ownership of the shack is disputed. This dispute is not material to the resolution of this case, however, because Ms. Swolinzky's claims for violation of her state and federal constitutional rights can be resolved notwithstanding the ongoing factual dispute.

### A.    Disputed Ownership of the Shack

Although the issue of ownership in the shack is not dispositive to summary judgment, the issue remains central to the ultimate resolution of the dispute between the parties. For this reason, the Court articulates the facts as they currently stand on this record, identifies what additional facts would be required to resolve the dispute, and summarizes an analogous Land Court decision concerning a cottage on another one of the Menemsha Creek lots.

The undisputed record establishes that the shack has stood in its present position near Menemsha Creek for over 100 years and that it is shown as existing on the 1939 Plan on land owned by the Commonwealth. [SOF ¶¶ 6–7]. The record also establishes that in 1970 the Department of Public Works conveyed land owned by the Commonwealth to certain towns and that the land conveyed to Aquinnah and Chilmark was "the land excepted from the original petition under Land Court Case No. 7706 because of its status as land of the commonwealth." [ECF No. 65-8]; see [SOF ¶¶ 8–9]. The record is silent on whether the shack stands on "land excepted from the original petition under Land Court Case No. 7706." The Town presents no

---

[21] To the extent the claim for intentional interference can be interpreted as being brought against Mr. Welch as well, it must fail for the same reasons as the claim against Ms. Wright fails.

facts supporting its ownership of the shack, separate from its claim to the land sitting below the shack stemming from the 1970 transfer.

The undisputed record also establishes that Ms. Swolinzky purchased the shack from Ms. Rose on April 11, 2013. [SOF ¶ 40]. The record does not provide the chain of title to the property leading up to this transaction; instead, Ms. Swolinzky states in a conclusory manner, without any record support, that ownership of the shack "ha[d] been documented and consistent for decades" before her purchase in 2013. [ECF No. 72 ¶ 154]. Rather than showing the chain of ownership to which she claims to belong, Ms. Swolinzky seeks to illustrate that structures on the Menemsha Creek lots have been historically treated by the Town as belonging to the leaseholders.[22]

In order to resolve whether Ms. Swolinzky or the Town has the superior claim of ownership in the shack, the Court would need a more complete factual record concerning the specific boundaries of Lot A, the location of the shack, the history of the shack dating to before 1939, and the extent to which the shack is fixed or moveable. These facts are not in the summary judgment record and would be better adjudicated with the benefit of expert testimony at a trial.

---

[22] For example, Ms. Swolinzky presents a permit from 1960 for Lot 3, which she contends states "[u]pon termination of this permit of extension thereof, the permitees shall remove any and all structures owned by them located on the premises . . . ." See [ECF No. 72 ¶ 153; ECF No. 73-1 at 2]. The permit is illegible at points, but even if it did state what Ms. Swolinzky contends it does, it would have no bearing on ownership of the shack. First, the shack's history differs from the other structures in the area because it was the only structure to survive the 1938 hurricane. [ECF No. 65-33 at 3]. Second, even if Lot 15, which is the former name of Lot A, and the shack had been subject to the exact same permitting requirements in 1960 as Lot 3, the shack's presence in the same location today suggests that it was either not a structure owned by a permittee that was required to be removed or some agreement with the Department of Public Works was reached whereby the shack did not need to be removed.

A similar dispute concerning ownership of a structure on a Menemsha Creek lot was adjudicated in Aquinnah's favor by the Land Court in 1982 in Gay Head v. Brown, MISC-93025, at *1 (Mass. Land Ct. April 30, 1982). In 1961, the defendant, Richard Brown, purchased a cottage located on Lot 2 in Aquinnah (as shown on the 1939 Plan) from Hazel Flanders, executrix of the estate of D. Herbert Flanders ("Flanders"). Id. at *3. Flanders built the cottage in 1939 and intermittently paid for and received use and occupancy permits from the Commonwealth.[23] Id. at *2–3. The bill of sale for Brown's purchase transferred "[a] one and one-half story building of wooden construction . . . ." Id. at *3. The land comprising Lot 2 was not listed as part of Flanders' estate, and the Land Court found that Hazel Flanders, as executrix, "had title to the cottage only." Id.

After Brown purchased the cottage in 1961, the Commonwealth issued a use and occupancy permit for Lot 2. Id. A second permit was issued in 1963, but Brown's request for a renewal of the permit in 1965 was never granted. Id. In 1970, as described in Section I.B., supra, the Commonwealth transferred to Aquinnah and Chilmark "the land excepted from the Original Petition in Land Court Case No. 7706 because of its status as land of the Commonwealth," which the Land Court found included Lot 2. Id. at *4. The Brown suit followed, in which Aquinnah sought to obtain possession of Lot 2 and to be declared the sole

_____

[23] The order in Gay Head v. Brown, MISC-93025 (Mass. Land Ct. April 30, 1982), describes the history of the land bordering Menemsha Creek. In 1903, the Commonwealth dredged a channel along the Aquinnah-Chilmark town line that connected the Vineyard Sound and Menemsha Pond. Brown, MISC-93025, at *2. As a result of the dredging, a new spit of land was created. Id. At least six cottages were erected on this new land prior to 1910, however, a hurricane in 1938 destroyed all of the cottages and washed away the spit of land created by the dredging. Id. Although all of the cottages were destroyed, the shack at issue here survived the storm. See id. at *9 (providing a topographic drawing of the land bordering Menemsha Creek circa 1938); [SOF ¶ 6]. After the hurricane, the Commonwealth re-dredged the channel, which reconstituted the spit of land that had been created by the previous dredging, but with some topographic changes. Brown, MISC-93025, at *2.

owner of the property. Id. at *1 (alleging that Brown's "actions and claim of ownership constitute a cloud on the title to town land" and seeking a writ of entry as well as an injunction enjoining Brown from "using, possessing, and trespassing" on Lot 2).

With regard to the cottage ostensibly purchased by Brown, the Land Court, relying on expert testimony, found that Aquinnah prevailed on its claim for a writ of entry because it had established by a preponderance of the evidence that "the defendant's cottage . . . is located on land that, in 1970, was land of the Commonwealth of Massachusetts by operation of law, and that title to Lot 2 passed to the town by virtue of the Commonwealth's deed to it in 1970." Id. at *4. The Land Court also found that as of 1939, the Commonwealth held title to Lot 2, that Brown's use of the cottage on Lot 2 was with the permission of the Commonwealth, and that "this permissive use did not become adverse to the Commonwealth at any time subsequent to 1963." Id. at *5.

Like the executrix in Brown, it is conceivable that Ms. Rose, as executrix of Alfred Vanderhoop's will, "[held] title to the [shack] only" dating back to before 1970 and that Ms. Rose sold that title to Ms. Swolinzky. It is also plausible that the shack sits on the land that the Commonwealth deeded to Aquinnah in 1970 and that any use of the shack prior to 1970 was with the permission of the Commonwealth. The outcome in Brown suggests that it is likely that Aquinnah has the superior ownership right in the land and could obtain a writ of entry ousting Ms. Swolinzky from the land, but it does not conclusively resolve what rights or remedies, if any, Ms. Swolinzky would have with regards to the shack once that occurred.

**B.**      **Unconstitutional Taking in Violation of the Fifth Amendments of the U.S. Constitution and Article 10 of the Massachusetts Declaration of Rights**

Ms. Swolinzky alleges that the Town took her property in violation of her constitutional right that private property not be taken by the Government without just compensation. [Am.

Compl. ¶¶ 37–56]. It is unnecessary for the Court to determine whether a taking of Ms. Swolinzky's property occurred in order to award summary judgment on these claims to the Town because Ms. Swolinzky's failure to exhaust her state remedies is dispositive.[24]

The Fifth Amendment to the U.S. Constitution provides that "private property [shall not] be taken for public use, without just compensation."[25]  U.S. Const. amend. V.  The Fifth Amendment "Takings Clause" proscribes only the taking of property without "just compensation," not the taking of all property. Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985). Accordingly, "a Fifth Amendment claim is premature until it is clear that the Government has both taken property *and* denied just compensation." Horne v. Dep't of Agric., 569 U.S. 513, 525–26 (2013). In order to meet the prerequisite that just compensation has been denied, a plaintiff must first seek compensation through state procedures, if procedures for doing so exist. Stillman v. Town of New Braintree, No. 12-cv-12033-TSH, 2013 WL 3830180, at *3 (D. Mass. July 22, 2013). Where "a plaintiff has not even tried to obtain compensation from the state, then [a court] cannot say that the state has denied the plaintiff just compensation." Elena v. Municipality of San Juan, 677 F.3d 1, 7 (1st Cir. 2012). Limited exceptions to this rule exist, such as where state remedies are

---

[24] To the extent that Ms. Swolinzky could demonstrate her ownership of the shack and exhaust her state remedies for just compensation, her unconstitutional takings claim could have merit.

[25] Ms. Swolinzky has not suggested that the protections of Article 10 differ from those afforded to her under the Fifth Amendment.  Accordingly, the Court addresses her federal claim only. See M.B. Claff, Inc. v. MBTA., 797 N.E.2d 426, 428 n.2 (Mass. App. Ct. 2003) (observing that "Article 10 affords protection parallel to that of the United States [Constitution]"). Further, the Court rejects the Town's contention that Ms. Swolinzky was required to plead her state constitutional claims under the Massachusetts Civil Rights Act ("MCRA"). [ECF No. 63 at 18–19]. Compare Orell v. UMass Mem'l Med. Ctr., Inc., 203 F. Supp. 2d 52, 71 (D. Mass. 2002) (requiring Article 16 free speech claim be brought under the MCRA), with Kitras v. Temple, No. 16-cv-11428-ADB, 2017 WL 4238862, at *2 (D. Mass. Sept. 25, 2017) (adjudicating motion to dismiss on Article 10 claim for takings claim not brought under the MCRA).

"unavailable or inadequate," <u>Williamson</u>, 473 U.S. at 196–97, but the plaintiff bears the burden of showing that such an exception applies, <u>Deniz v. Municipality of Guaynabo</u>, 285 F.3d 142, 146 (1st Cir. 2002).

Here, even assuming *arguendo* that Ms. Swolinzky owns the shack and that there has been a taking by the Town, Ms. Swolinzky cannot prevail on her claim of an unconstitutional taking under the Fifth Amendment because she has not exhausted her state remedies or shown that her case falls within an exception to the exhaustion requirement. <u>See</u> <u>Stillman</u>, 2013 WL 3830180, at *4. Massachusetts' inverse condemnation statute provides that a person whose real estate has been damaged by a taking and who is entitled to compensation may "petition for the assessment of such damages to the superior court." Mass. Gen. Laws ch. 79, §§ 10, 14. Ms. Swolinzky does not reference any such petition under the inverse condemnation statute and makes no effort to carry her burden of showing that a remedy under Chapter 79 is unavailable to her or otherwise inadequate. Accordingly, summary judgment on the unconstitutional takings claims under the Fifth Amendment and Article 10 must be granted for the Town.[26]

### C.     Procedural Due Process Violations Under the Fourteenth Amendment to the U.S. Constitution and Article 12 of the Massachusetts Declaration of Rights

Ms. Swolinzky asserts procedural due process claims against the Board of Selectmen for the allegedly unconstitutional taking of her property without notice, in violation of the Fourteenth Amendment to the U.S. Constitution and Article 12 of the Massachusetts Declaration of Rights.[27] [Am. Compl. ¶¶ 37–56].

---

[26] Ms. Swolinzky also asserts a claim under Article 10 against the individual defendants, Ms. Wright and Mr. Welch. [Am. Compl. ¶¶ 51–53]. That claims fails for the same reasons articulated in Section V.B., <u>supra</u>.

[27] Massachusetts courts have stated that they "treat the procedural due process protections of the Massachusetts and United States Constitutions identically." <u>Doe v. Attorney Gen.</u>, 686 N.E.2d 1007, 1013 n.8 (Mass. 1997) (citing <u>Liability Investigative Fund Effort, Inc. v. Mass. Med.</u>

The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV. "Procedural due process" affords all citizens a right to notice and a right to be heard before the state deprives them of a protected property interest.  See Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) ("The basic guarantee of procedural due process is that, 'before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner.'" (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990))).

Assuming that Ms. Swolinzky has a protected property interest in the shack, Ms. Swolinzky has not exhausted her state remedies for challenging an unconstitutional taking, as described in Section V.B., supra.  Because she has not proceeded through appropriate state procedural channels to seek recompense for any taking that may have occurred, she may not allege a constitutional due process violation premised on the same taking.  See Rupprecht v. City of Pittsfield, 225 F. App'x 1, 2 (1st Cir. 2007) ("Exhaustion of state remedies is a prerequisite for procedural due process and Fifth Amendment takings claims.").  Accordingly, summary judgment must be granted for the Town on the procedural due process claim.[28]

### D.    Civil Conspiracy

Building on her claims related to the uncompensated "taking" of the shack, Ms. Swolinzky alleges that "[t]he individual Defendants acting as the Board of Selectmen" conspired

_____

Professional Ins. Ass'n, 636 N.E.2d 1317, 1322 (Mass. 1994)).  For this reason, the Court addresses the federal procedural due process claim only.

[28] Ms. Swolinzky also asserts a similar claim under Article 12 against the individual defendants, Ms. Wright and Mr. Welch.  [Am. Compl. ¶¶ 51–53].  That claim fails for the same reasons articulated in Section V.C., supra.

with one another to violate Ms. Swolinzky's constitutional rights "by awarding the lease of Lot A and the shack to another party based on political favoritism and nepotism."[29]   [Am. Compl. ¶ 58].   To prevail on a claim of civil conspiracy, a plaintiff must produce evidence demonstrating (i) an agreement; (ii) to commit a tortious act; (iii) where the participants know of the agreement and its purpose; and (iv) "take affirmative steps to encourage the achievement of the result" of the agreement or plan.  Kuker v. Hill, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998).

The undisputed material facts fail to show any agreement between Ms. Wright and Mr. Newman to violate Ms. Swolinzky's constitutional rights.  Mr. Newman abstained from the April 23, 2013 vote that allegedly rescinded the Town's agreement to give Ms. Swolinzky a lease to Lot A, but initiated the December 3, 2013 vote "to reconfirm [Mr. Welch's] right to Lot A and that the building stays on lot A as Town Owned Property."  See [SOF ¶ 43; ECF No. 65-22 at 3; ECF No. 73-17 at 3]; see also [ECF No. 73-12 at 8].  Mr. Newman's initial suggestion that Ms. Swolinzky move to Lot A, his motion to change the lot lines in Ms. Swolinzky's favor on January 22, his raising the issue of Ms. Swolinzky's ownership rights in the shack at the April 23 meeting, and his abstention from the April 23 vote show that he was acting more often in Ms. Swolinzky's favor rather than against it.  See [ECF No. 65-14 at 2; ECF No. 65-16 at 2; ECF No. 65-22 at 2].

Similarly, the undisputed facts fail to show any agreement between Ms. Wright and Mr. Booker, who voted with Ms. Wright on April 23, 2013, but who voted against her on the December 3, 2013 motion.  See [ECF No. 65-22 at 3; ECF No. 73-17 at 3].  Like Mr. Newman, Mr. Booker took actions in Ms. Swolinzky's favor, including proposing on April 2 to review "all the lease lot's frontage on the Menemsha Creek" and to move more lots around in order to add

---

[29] The Court interprets the civil conspiracy claim to be pled against Ms. Wright, the only individual defendant who is on the Board.

space for leaseholders, including Ms. Swolinzky.   See [ECF No. 65-19 at 2].   In addition, at the April 23 meeting, he proposed allowing Mr. Vanderhoop, as first on the wait list, to choose between Lots A and F, rather than assigning Lot F directly to Mr. Vanderhoop.   [SOF ¶ 43; ECF No. 65-22 at 3].   Finally, on December 3, Mr. Booker voted against the proposal to take the shack as Town property, which he believed was "wrong" at the time.   [ECF No. 73-2 at 13–14].[30]

Even drawing all reasonable inferences in Ms. Swolinzky's favor, the variation in the voting patterns of Mr. Newman and Mr. Booker and their proposals regarding the Menemsha Creek lots demonstrate that the Board of Selectmen was not acting in concert pursuant to an agreement with Ms. Wright to violate Ms. Swolinzky's constitutional rights.   To the extent that the actions of Mr. Booker or Mr. Newman were not favorable to Ms. Swolinzky at times, there is no evidence suggesting that either had knowledge of any plan or agreement coordinated by Ms. Wright.   Accordingly, summary judgment on the civil conspiracy claim is granted in favor of Ms. Wright.

### E.   Federal Civil Rights Claim

Ms. Swolinzky asserts a claim under 42 U.S.C. § 1983 ("Section 1983") against "the Defendants, individually and collectively," for alleged violations of her rights under the Fourth,

---

[30] At the deposition of Mr. Booker, the following questions were asked and answered:

> Q: Spencer, at the December 3rd meeting, you didn't agree that it was appropriate to take the shack from Wendy, did you?
> MR. BARNETT: Objection.
> A: I don't think I did.
> Q: You voted not -- you voted against taking the shack from her, didn't you?
> A: I believe I did.
> Q: You thought it was wrong, wouldn't you agree?
> A: I did at the time, yup. Yup.

[ECF No. 73-2 at 13].

Fifth, and Fourteenth Amendments.[31]   [Am. Compl. ¶¶ 54–56]. Specifically, Ms. Swolinzky claims that the Defendants' actions, while they were acting under the color of law, "denied [her] the economically viable use of her property, [and] awarded the lease of Lot A and the so-called 'shack' on the basis of political favoritism . . . ." [Id. ¶ 55].

To the extent Ms. Swolinzky's Section 1983 claim is premised on an unconstitutional taking or a procedural due process violation, for the reasons stated in Sections V.B. and V.C., supra, this claim also fails.   See Marietta Realty, Inc. v. Springfield Redevelopment Auth., 902 F. Supp. 310, 313 (D. Mass. 1995) ("Where a claimant seeks a post-deprivation remedy and the laws of that state provide an adequate one, the plaintiff cannot bring a § 1983 action without first exhausting the laws of the state."). The remaining constitutional violations underlying Ms. Swolinzky's Section 1983 claim concern her Fourth Amendment and Fourteenth Amendment rights.[32]   For the reasons described below, these claims also do not survive summary judgment.[33]

      1.    Municipal Liability

Under the framework established by Monell v. Department of Social Services of the City

---

[31] It is not clear whether Ms. Swolinzky's Section 1983 claim is asserted against Mr. Welch.  See [Am. Compl. ¶ 55 ("The actions of the Defendants, individually and collectively . . . .")].  To the extent that it is, summary judgment must be granted for Mr. Welch on the Section 1983 claim because no reasonable jury could conclude based on the undisputed facts that he acted under color of law at any time during his interactions with Ms. Swolinzky.

[32] Ms. Swolinzky also asserts a claim under Article 12 of the Massachusetts Declaration of Rights.  Because Massachusetts courts treat due process claims under Article 12 and the Fourteenth Amendment in the same way, the Court addresses Ms. Swolinzky's federal claim only.  See Trigones v. Attorney Gen., 652 N.E.2d 893, 896 (Mass. 1995) ("For the purpose of due process analysis, our standard of review under the cognate provisions of the Massachusetts Declaration of Rights usually is comparable to that under the Fourteenth Amendment to the United States Constitution." (citing Rushworth v. Registrar of Motor Vehicles, 596 N.E.2d 340, 343 (Mass. 1992))).

[33] Where there has been no finding of a constitutional violation, the Court does not need to reach Ms. Wright's argument that she is entitled to qualified immunity.  [ECF No. 61 at 7–8].

of New York, 436 U.S. 658 (1978), municipalities and other local government units may be included among "persons" to whom Section 1983 applies. 436 U.S. at 690. To state a claim under Monell, a plaintiff must establish either an officially adopted "policy statement, ordinance, regulation or decision" or an unofficial "custom" that caused a deprivation of the plaintiff's constitutional rights. Id. The Town argues that summary judgment for it is proper on the Section 1983 claim because Ms. Swolinzky has failed to identify any official policy or custom that has caused a deprivation of her constitutional rights. [ECF No. 63 at 17–18]. The Court agrees.

In her opposition brief, Ms. Swolinzky points to the Town's application of the "shared usage" and "commercial fisherman" lease provisions used for the waterfront lots. [ECF No. 71 at 20–21]. It is unclear if Ms. Swolinzky considers the lease provisions to be a "policy" or "custom;" regardless, her claim fails against the Town because there is no evidence of causation between these lease provisions and any claimed violation of her constitutional rights. See, e.g., Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997); Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005). These are the same policies that underlie Ms. Swolinzky's Equal Protection claim, and, as explained in Section V.D.4., infra, no constitutional violations stem from the application of these lease terms.

2.      Unreasonable Seizure in Violation of the Fourth Amendment[34]

Ms. Swolinzky also asserts a claim for unreasonable seizure in violation of the Fourth Amendment of the U.S. Constitution. [Am. Compl. ¶¶ 37–56]. Without needing to address whether there was in fact a "seizure" under the Fourth Amendment or whether the claim is

---

[34] Ms. Swolinzky does not assert a parallel claim for unlawful seizure under Article 14 of the Massachusetts Declaration of Rights.

properly pled, the Court concludes that summary judgment must enter against Ms. Swolinzky because, if any seizure occurred, it was not unreasonable.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Whether a seizure is "reasonable" is determined by a "careful balancing of governmental and private interests." Soldal v. Cook Cnty., 506 U.S. 56, 71 (1992) (quoting New Jersey v. T.L.O., 469 U.S. 325, 341 (1985)). Reasonableness is the "ultimate touchstone of the Fourth Amendment." Michigan v. Fisher, 558 U.S. 45, 47 (2009) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). The First Circuit has not provided guidance on addressing the reasonableness of a real property seizure in the civil context. See Costas-Elena v. Municipality of San Juan, 714 F. Supp. 2d 263, 269 (D.P.R. 2010). As one of our sister courts has observed, "the dearth of such claims is but one indicator of how ill-suited the Fourth Amendment is" to such a situation. Id.

Here, neither party has briefed the issue of reasonableness. The Court interprets the Town to be asserting that its ownership of the land on which the shack sits, and the shack's status as a fixture, defeats any Fourth Amendment claim, an argument that Ms. Wright adopts. See [ECF No. 60 at 1 (incorporating by reference the Town's arguments); ECF No. 63 at 11–13]. The Court understands Ms. Swolinzky to be contending that a seizure occurred on December 3, 2013, when the Board voted to take the shack as Town property without notice to her, and to be challenging the Town's use of Section 17 of the lease to take possession of the shack. See [ECF No. 71 at 13–14]. Construing the facts in Ms. Swolinzky's favor, the Court infers for the

purposes of this analysis that the structure is not a fixture and assumes that Ms. Swolinzky owns the shack.

Balancing the private and governmental interests at stake leads to the conclusion that it was not unreasonable for the Town, in its exercise of its municipal powers, to take possession of the shack. See Soldal, 506 U.S. at 71. Any interest Ms. Swolinzky has in the shack is limited to its use and does not encompass any rights or title to the land surrounding the shack. Ms. Swolinzky agrees that the shack sits on land owned and regulated by the Town. See [ECF No. 72 at 2]. Ms. Swolinzky's use of the shack and access to Lot A was previously at the permission of the former leaseholder, Ms. Rose, and thereafter resulted in claims of trespass and conversion brought by Mr. Welch. See [ECF No. 26 ¶¶ 22–27 (asserting counterclaims)]. Removing the shack from Lot A appears to be physically possible but currently seemingly prevented by logistical and bureaucratic obstacles, such as permits. See, e.g., [ECF No. 65-2 at 8 ("Q: Based upon the review by engineers, is the move of the shack actually feasible? A: Oh, yeah, easy."); ECF No. 65-33]. The Court weighs this limited interest against the Town's significant interests in maintaining one of the oldest properties in the Town, enforcing the provisions of its municipal leases, and providing public spaces for the community. Each of these interests outweighs the limited property interest Ms. Swolinzky may have in accessing a structure on land that is not owned, controlled, or leased by her. In addition, Ms. Swolinzky received notice of any seizure before it occurred. See [ECF No. 65-30 (providing notice under Section 17)].[35] Accordingly,

---

[35] Ms. Swolinzky primarily challenges the notice provided for the December 3, 2013 meeting. See [ECF No. 71 at 17 ("Plaintiff was never given, nor offered, any form of prior notice of the taking . . . ."); id. at 18 ("The Plaintiff alleges that the Town failed to provide her with notice of any kind whatsoever prior to the taking of the shack as Town property."); Am. Compl. ¶¶ 46, 48 (alleging that the taking occurred on December 3, 2013)]. She asserts in the Amended Complaint that the Board violated the Open Meeting Law, Mass. Gen. Laws ch. 30A, § 20(c). [Am. Compl. ¶¶ 47, 50]. Ms. Swolinzky, however, does not have standing to bring a claim

assuming *arguendo*, that this claim is properly pled and that there was a seizure, summary judgment on the Fourth Amendment claim must be granted against Ms. Swolinzky based on the reasonableness of any seizure.

> 3.   Substantive Due Process Claims Under the Fourteenth Amendment and Article 12

The Amended Complaint pleads a substantive due process claim under the Fourteenth Amendment and Article 12 based on the denial of Ms. Swolinzky's rights to "free and unfettered access to her personal property" and to "the practical value of her property." [Am. Comp. ¶¶ 46, 48, 52, 55]. Even assuming that Ms. Swolinzky owned the property at issue, there has been no conscience-shocking behavior by the Board of Selectmen, and summary judgment is therefore granted for Ms. Wright on the substantive due process claim.[36]

Substantive due process, which stems from the same clause in the Fourteenth Amendment as procedural due process, "prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty." United States v. Salerno, 481 U.S. 739, 746 (1987) (internal quotations and citations omitted). Particularly in the context of land planning disputes, "[t]he threshold for establishing the requisite 'abuse of government power' is a high one . . . ." Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992). Specifically,

---

under the Open Meeting Law. See Mass. Gen. Laws ch. 30A, §§ 23(b), (f) (allowing for an individual to file complaint with the attorney general after filing a complaint with the relevant public body and for civil actions to be brought by "3 or more registered voters"). She does not contend that the February 5, 2014 letter did not provide her adequate notice of the subsequent seizure; rather, she asserts that it was "an attempt to justify [the Board's] action of December 3." [ECF No. 71 at 14].

[36] The Court does not need to reach the issue of whether Ms. Swolinzky was required to bring her Article 12 due process claim under the MCRA, as the Town contends, because the facts also do not support a substantive due process violation under the MCRA. [ECF No. 63 at 18–19].

> Substantive due process, as a theory for constitutional redress, has . . . been disfavored, in part because of its virtually standardless reach. To apply it to claims [alleging that permitting officials were motivated by political factors and parochial views of local interests] would be to insinuate the oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals.

Id. In the same vein, cases from the First Circuit make it clear that "regulatory board[s]" do not violate constitutional due process rights even when they make decisions "for erroneous reasons" or make "demands which arguably exceed [their] authority under the relevant state statutes." Licari v. Ferruzzi, 22 F.3d 344, 350 (1st Cir. 1994) (quoting Amsden, 904 F.2d at 757). In fact, "[e]ven bad-faith violations of state law are not necessarily tantamount to unconstitutional deprivations of due process." Amsden, 904 F.2d at 757.

Ms. Swolinzky's limited attempt at meeting this high burden fails. See [ECF No. 71 at 17–19]. As best as can be gleaned from her briefing, Ms. Swolinzky considers the conduct that violated her substantive due process to be the "fail[ure] to provide her with notice of any kind whatsoever prior to the taking of the shack as Town property." [Id. at 18]. She contends that the Town failed to provide proper notice for the December 3, 2013 Board of Selectmen meeting and adds that Mr. Booker, who was on the Board at the time, considered the Town's actions at the December 3, 2013 meeting to be inappropriate. [Id. at 18–19; Am. Compl. ¶ 50]. Ms. Swolinzky does not address the letter the Town sent to her and Ms. Rose on February 5, 2014, which provided formal notice that the Town was exercising its rights under the lease to take control of the shack, other than to say that it was merely "an attempt to justify [the Board's] action of December 3." See [ECF No. 65-30; ECF No. 71 at 14]. Even construing the facts as favorably as possible in Ms. Swolinzky's favor, the conduct of the Board of Selectmen referenced by Ms. Swolinzky does not "shock[] the conscience" or rise to the level of a

substantive due process violation.[37]   See, e.g., S. Commons Condo. Ass'n v. City of Springfield, 967 F. Supp. 2d 457, 469 (D. Mass. 2013) ("It is significant . . . that the allegations underlying Plaintiffs' substantive due process claims are to a very large extent indistinguishable from those underlying Plaintiffs' procedural due process claim. This is usually the hallmark of a weak substantive due process claim."). Accordingly, summary judgment must be granted for Ms. Wright on the substantive due process claims.

### 4.    Equal Protection Claim

Ms. Swolinzky next asserts a claim for disparate treatment in violation of the Equal Protection Clause. [Am. Compl. ¶ 55]. Even assuming that Ms. Swolinzky owns the shack, the Court concludes that Ms. Wright's actions did not violate Ms. Swolinzky's Equal Protection rights.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." Thayer v. City of Worcester, 979 F. Supp. 2d 143, 159 (D. Mass. 2013), aff'd in part and remanded, 755 F.3d 60 (1st Cir. 2014). "The 'similarly situated' requirement must be enforced with particular rigor in the land-use context because

---

[37] Although the Amended Complaint seems to identify various rights that were denied to Ms. Swolinzky based on the Board of Selectmen's conduct, such as the right to "free and unfettered access to her personal property" or to "the practical value of her property," [Am. Comp. ¶¶ 48, 52], no party has briefed the issue. The Court, therefore, limits its analysis to the issue of whether the Board's behavior was conscience-shocking.

zoning decisions 'will often, perhaps almost always, treat one landowner differently from another.'"  See Cordi-Allen v. Conlon, 494 F.3d 245, 250–55 (1st Cir. 2007).

Even if the Amended Complaint could be interpreted to sufficiently allege disparate treatment and to identify similarly situated individuals, which the Court questions, no facts in the summary judgment record evidence that Ms. Swolinzky was subject to unequal treatment.  Ms. Swolinzky argues that she was "targeted" for violations of the "shared usage" provision of the lease of Lot A with Ms. Rose, whereas Mr. Welch has violated the same provision with no consequences.  [ECF No. 71 at 20].  She also argues that the Board has never inquired into Mr. Welch's compliance with the lease restrictions regarding commercial fishing or aquaculture. [Id.].

As to the first point, there are no facts indicating that Ms. Swolinzky was "targeted" for her shared usage with Ms. Rose.  It was Ms. Rose's lease that was terminated by the Town, not Ms. Swolinzky's, and it was terminated for two independent reasons: failure to open a business and shared usage.  [ECF No. 65-13 at 2].  The enforcement of the shared usage provision was secondary to Ms. Rose's failure to operate a business on Lot A, which she had promised the Board she would do and had been given a full year to do so.  See [ECF No. 65-6 at 16; ECF No. 65-13].  The fact that Ms. Rose had the shared usage term enforced against her and that Mr. Welch may not have does not implicate Ms. Swolinzky's Equal Protection rights.

With regard to the second point, there is simply no disparate treatment regarding enforcement of the commercial fishing or aquaculture lease restrictions.  By all indications, the Board of Selectmen has regularly not enforced the provision of the 1995 Menemsha Creek Agreement which requires any lessee to be "a bona fide commercial fisherman" and to "have engaged in that activity for at least three years prior to application for a lot lease."  See [ECF No.

65-10 at 2]; see also [ECF No. 65-9 at 2 (noting in law conveying land to Aquinnah that "[t]he above-described land shall be reserved for and made available to commercial fishermen . . . .")]. Indeed, Ms. Swolinzky has been allowed to run her Book-a-Boat business out of Lot B for over a decade, even though it does not seem that she has ever been a bona fide commercial fisherman. Cf. [SOF ¶ 11 (providing definition of "commercial fisherman")]. Accordingly, summary judgment on Ms. Swolinzky's Equal Protection claims must be granted for Ms. Wright.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [ECF Nos. 60, 62] are GRANTED on all counts of the Amended Complaint.

**SO ORDERED.**

March 29, 2019                                           /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE